**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**TERRI BEEBE,**

                                        **Plaintiff,**

        **vs.**                                                **5:10-CV-1467**
                                                               **(MAD)**

**MICHAEL J. ASTRUE, Commissioner of**
**Social Security,**

                                        **Defendant.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

OLINSKY & SHURTLIFF                    Howard D. Olinsky, Esq.
527 State Street
Schenectady, New York 12305
_Attorneys for Plaintiff_

Social Security Administration           Tracy Udell, Esq.
Office of Regional General Counsel
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
_Attorneys for Defendant_

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

Plaintiff Terri Beebe, brings the above-captioned action pursuant to 42 U.S.C. §§ 405(g)

and 1383(c)(3), seeking a review of the Commissioner of Social Security's decision to deny her

application for disability insurance benefits ("DIB") and supplemental security income ("SSI").

**PROCEDURAL BACKGROUND**

On August 26, 2007, plaintiff protectively filed an application for SSI and DIB benefits. (Administrative Transcript at p. 153-165).[1]  Plaintiff was 35 years old at the time of the application with prior work experience as a stock clerk.  (T. 221).  Plaintiff claimed that she was disabled, beginning on January 27, 2004 due to an injury that she sustained while at work. Plaintiff claims she was lifting a heavy box and suffered the following impairments: pain in her neck, back, leg and hand; depression; tingling in her arms and legs; and migraine headaches. (T. 494).  On December 6, 2007, plaintiff's application was denied and plaintiff requested a hearing by an ALJ which was held on August 5, 2009.  (T. 92-103).  Plaintiff appeared with an attorney. On August 11, 2009, the ALJ issued a decision denying plaintiff's claim for benefits.  (T. 73-81). On December 22, 2009, the Appeals Council granted plaintiff's request for review.  (T. 82-86). On May 5, 2010, a second hearing was held.  On June 9, 2010, the ALJ issued a decision denying plaintiff's claim for benefits.  (T. 491-504).  The Appeals Council denied plaintiff's request for review making the ALJ's decision the final determination of the Commissioner. (T. 488).  This action followed.

**DISCUSSION**

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities."  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  There is a five-step analysis for evaluating disability claims:

---

[1]  "(T. )" refers to pages of the administrative transcript and supplemental administrative transcript, Dkt. Nos. 9 and 13.

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted).

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw*, 221 F.3d at 131. Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

The ALJ found at step one that plaintiff had not engaged in substantial gainful activity since January 27, 2004. (T. 494). At step two, the ALJ concluded that plaintiff suffered from cervical degenerative disc disease, low back pain, leg pain and depression which qualified as "severe impairments" within the meaning of the Social Security Regulations (the "Regulations"). (T. 494). At the third step of the analysis, the ALJ determined that plaintiff's impairments did not meet or equal the severity of any impairment listed in Appendix 1 of the Regulations. (T. 494). The ALJ found that plaintiff had the residual functional capacity ("RFC") to, "to lift, carry, sit, stand, and walk in the light range of work; can only occasionally do overhead work; can only occasionally bend; is limited to simple work; and needs to be provided with the same regular

breaks during mid-morning, for noon/lunch and during mid-afternoon that are available to all workers". (T. 497).  At step four, the ALJ concluded that plaintiff was not capable of performing any past relevant work.  (T. 501).  The ALJ obtained the testimony of a vocational expert to determine whether there were jobs plaintiff could perform.  Based upon the vocational expert's testimony, the ALJ concluded at step five, that plaintiff was capable of making a successful adjustment to work that exists in significant numbers in the national economy such as work as a counter clerk and shipping receiving weigher. (T. 503).  Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act.  (T. 503).

In seeking federal judicial review of the Commissioner's decision, plaintiff argues that: (1) the Commissioner erred by failing to find that plaintiff's back impairment met Listing § 1.04; (2) the ALJ failed to properly evaluate the medical evidence; (3) the ALJ failed to properly assess plaintiff's credibility; (4) the ALJ's RFC assessment is not supported by substantial evidence; and (5) the vocational expert's testimony does not support the ALJ's decision . (Dkt. No. 11).

## I.      Meet or Medically Equals a Listed Impairment–Listing § 1.04A

A claimant is automatically entitled to benefits if her impairment(s) meets the criteria set forth in Appendix 1 to Subpart P of Part 404. *McKinney v. Astrue*, 2008 WL 312758, *4 (N.D.N.Y. 2008).  The burden is on the plaintiff to present medical findings which show that her impairments match a listing or are equal in severity to a listed impairment.  *Zwick v. Apfel*, 1998 WL 426800, at *6 (S.D.N.Y.1998).  In order to show that an impairment matches a listing, the claimant must show that her impairment meets all of the specified medical criteria.  *Pratt v. Astrue*, 2008 WL 2594430, at *6 (N.D.N.Y.2008) (citing *Sullivan v. Zebley*, 493 U .S. 521, 530 (1990)) (holding that if a claimant's impairment "manifests only some of those criteria, no matter how severely," such impairment does not qualify).  Courts have required an ALJ to provide an

explanation as to why the claimant failed to meet or equal the Listings, "[w]here the claimant's symptoms as described by the medical evidence appear to match those described in the Listings." *Rockwood v. Astrue*, 614 F.Supp.2d 252, 273 (N.D.N.Y. 2009) (citation omitted). If an ALJ's decision lacks an express rationale for finding that a claimant does not meet a Listing, a Court may still uphold the ALJ's determination if it is supported by substantial evidence. *Id.* (citing *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir.1982)).

The requirements of disability for spine disorders listed in 20 C.F.R. Part 404, Subpt. P, App. 1, state:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

The plaintiff's medical records must demonstrate that plaintiff suffered from nerve root compression and each of the four characteristics required by the Listing for the relevant time period. *See Sullivan*, 493 U.S. at 530.

In the decision, the ALJ stated:

> the claimant's cervical degenerative disc disease, low back pain, leg pain and depression, when considered singly and in combination, do not meet or medically equal the severity of any impairment set fort in sections 1.04 or 12.04 of the Listings.

(T. 495).

Plaintiff claims that substantial evidence supports a finding that her back impairments met the severity of Listing 1.04. Plaintiff argues that the Commissioner erred when he failed to

discuss the Listing in any detail.  Plaintiff moves for an order vacating the decision remanding the matter solely for the purposes of calculation of benefits.  (Dkt. No. 11, p. 16).  Defendant contends that although the ALJ failed to specify his findings relating to Listing 1.04, substantial evidence supports his conclusion and thus, remand is unwarranted.

The first requirement to meet Listing § 1.04A is "evidence of nerve root compression characterized by neuro-anatomic distribution of pain".  *Pitcher v. Barnhart*, 2009 WL 890671, at *11 (N.D.N.Y.2009) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1). Plaintiff argues that the following objective studies support her claim and the diagnosis of cervical degenerative disc disease and cervical radiculopathy: (1) x-ray films; (2) August 2007 MRI films; and (3) January 2010  nerve conduction studies support.[2]

The medical record reveals that on August 23, 2007, plaintiff had an initial consultation with Carri A. Jones, M.D. at Electrodiagnostic Medicine Consultation.  Plaintiff complained of constant pain in her neck.  Upon examination, Dr. Jones noted positive findings including decreased sensation on the left, tenderness over the left arm and cervical spine area and limited flexion and rotation of the head. (T. 360).  Dr. Jones indicated, "[p]lain films show degenerative disc disease C5-6, C6-7".  On the same day, plaintiff underwent an MRI of her cervical spine at Lake Radiology.  (T. 368).  The films revealed, "[m]inimal discal changes at C4-5 and C5-6 with no impingement on neural elements".

On January 13, 2010, Rina Davis, M.D. at New York Spine and Wellness Center reviewed plaintiff's EMG and NCV and prepared a report. (T. 481).  Dr. Davis found, "[t]hese findings are

---

[2] Radiculopathy is a disease of the nerve roots. *Dorland's Illustrated Medical Dictionary*, 1595 (31st ed.2007).

suggestive of a right sided cervical radiculitis.  There is no definite evidence of radiculopathy, peripheral neuropathy or peripheral nerve entrapment, such as carpal tunnel syndrome".

These films do not support the conclusion that plaintiff suffered from nerve root compression.  Indeed, plaintiff does not even argue that she suffers from nerve root compression. In addition to the tests cited by plaintiff, other objective studies were performed that do not support plaintiff's contentions.  On April 12, 2007, plaintiff had a Motor NCS, Sensory NCS, F Wave/H reflex and Needle EMG at Electrodiagnostic Medicine Consultation.  Dr. Jones opined that the studies were normal. (T. 362).  On April 16, 2008, Dr. Davis opined that the results of plaintiff's first EMG and NCV studies were "normal".  (T. 453).  Further, on March 28, 2009, plaintiff had a second MRI of her cervical spine at Syracuse Orthopedic Specialists.  (T. 464). The film revealed, "minimal disc bulging but no herniation or stenosis".

Based upon the record, plaintiff has not established that she satisfied all the criteria symptoms of the Listing as she has failed to establish that she suffered from nerve root compression.  Therefore, the ALJ's determination that Plaintiff did not meet Listing 1.04A was supported by substantial evidence.  "[T]the ALJ's failure to provide a specific rationale for finding that plaintiff's spinal impairment did not meet Listing 1.04A does not prevent this Court from upholding his determination because substantial evidence, [ ], supports the ALJ's determination." *Rockwood*, 614 F.Supp.2d 273 (citing *Berry*, 675 F.2d at 468).

**II.    RFC**

Residual functional capacity is:

> "what an individual can still do despite his or her limitations....
> Ordinarily, RFC is the individual's maximum remaining ability to do
> sustained work activities in an ordinary work setting on a regular and
> continuing basis, and the RFC assessment must include a discussion
> of the individual's abilities on that basis. A 'regular and continuing

> basis' means 8 hours a day, for 5 days a week, or an equivalent work
> schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, Policy Interpretation Ruling

Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96–8p"), 1996

WL 374184, at *2 (S.S.A. July 2, 1996)). In making the RFC determination, the ALJ must

consider a claimant's physical abilities, mental abilities, symptomology, including pain and other

limitations which could interfere with work activities on a regular and continuing basis. 20 C.F.R.

§ 404.1545(a).  The ALJ must consider all the relevant evidence, including medical opinions and

facts, physical and mental abilities, non-severe impairments, and plaintiff's subjective evidence of

symptoms. 20 C.F.R. §§ 404.1545(b)-(e).

Plaintiff claims that the RFC is unsupported by substantial evidence because the ALJ

failed to follow the treating physician rule and assigned inappropriate weight to the medical

evidence.  To wit, plaintiff claims that the ALJ: (1) erred when he afforded "little weight" to

Nurse Suzanne Shafer's Medical Source Statements which were co-signed by Mary Trusilo,

M.D.; (2) failed to recontact Nurse Shafer or Dr. Trusilo to resolve any perceived conflict; and (3)

inappropriately assigned "significant weight" to the opinions of the state agency medical

examiner.

The Second Circuit has defined a treating physician as one "who has provided the

individual with medical treatment or evaluation and who has or had an ongoing treatment and

physician-patient relationship with the individual." *Coty v. Sullivan*, 793 F.Supp. 83, 85–86

(S.D.N.Y.1992) (quoting *Schisler v. Bowen*, 851 F.2d 43 (2d Cir.1988)).  Under the Regulations,

a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa*, 168 F.3d at

78–79; *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993).  When an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including:

> (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

20 C.F.R. § 404.1527(d)(2). The Regulations also specify that the Commissioner "will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004) (citing 20 C.F.R. § 404.1527(d)(2)); *see also Schaal v. Apfel*, 134 F.3d 501, 503–504 (2d Cir.1998).

Social Security Ruling 06–03p provides:

> In addition to evidence from "acceptable medical sources," we may use evidence from "other sources," as defined in 20 CFR 404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function. These sources include, but are not limited to:

> • Medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists ...;

> Information from these "other sources" cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose. However, information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

SSR 06–03p, 2006 WL 2329939, at *2–3 (S.S.A. 2006).

Opinions from medical sources that are not considered acceptable medical sources are "important and should be evaluated on key issues such as impairment severity and functional effects." *Anderson v. Astrue*, 2009 WL 2824584, at *9 (E.D.N.Y.2009) (quoting SSR 06–03p). The Regulations provide that the Secretary will consider, "evidence from other sources to show the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to work." *See* 20 C.F.R. § 404.1513(e). In weighing the opinions of "other sources", the ALJ must use the same factors for the evaluation of the opinions from "acceptable medical sources" enumerated in 20 C.F.R. § 404.1527(d). *Canales v. Comm'r of Soc. Sec.*, 698 F.Supp.2d 335, 344 (E.D.N.Y.2010).

### A.     Suzanne Shafer, ANP and Mary Trusilo, M.D.

On February 18, 2008, plaintiff was examined at New York Pain Center.  The progress note for that visit is signed by "Suzanne M. Shafer, ANP for Eric A. Talllarico, M.D." (T. 460). Plaintiff complained of neck and left arm pain with a severity of "7 out of 10".  At the time of the examination, plaintiff was taking Lyrica, Motrin, Lidocaine, Ultracet and Flexeril.[3]  Upon examination, Nurse Shafer found tenderness in the neck area, full range of motion of right upper extremity with limited range in the left, weaker handgrip on the left and "classical fibromyalgia tender points".  Nurse Shafer noted that nerve conduction/EMG studies were negative and the cervical MRI revealed "minimal disc changes".  Nurse Shafer's initial impression was neck pain, cervical degenerative disc disease and arm pain.  Nurse Shafer encouraged plaintiff to try Lyrica

---

[3] Lyrica is a medication used to relieve neuropathic pain and to relieve the pain of fibromyalgia. www.ncbi.nim.nih.gov/pubmedhealth/PMH0000327 (last visited August 20, 2012). Flexeril is a skeletal muscle relaxant for relief of muscle spasms. *Dorland's*, at 465, 725. Ultracet is an opioid analgesic used for the treatment of moderate to moderately severe pain following surgical procedures and oral surgery; administered orally. *Id.* at 1755. Lidoderm is a brand name for lidocaine, a local anesthetic that is applied topically to the skin and mucous membranes. *Id.* at 1048.

at bedtime and Relafen.[4]  Nurse Shafer ordered updated EMG's of the upper extremities and

opted to postpone nerve blocks until the EMG's were conducted.  (T. 461).  On April 11, 2008,

plaintiff returned to New York Pain Center and saw Nurse Shafer.  Nurse Shafer noted that the

nerve blocks were "on hold" pending updated NCV and EMG studies and prescribed Lyrica and

Norco.[5] (T. 459).

  On September 2, 2008, plaintiff returned to New York Pain Center and treated with Nurse

Shafer. (T. 449).  Upon examination, Nurse Shafer noted trapezius tenderness, normal strength in

the neck, no tremors, pain with flexion, rotation and extension and a weak handgrip in the right

upper extremity.  Nurse Shafer noted that "MRI and EMGs within normal limits" and

acknowledged that plaintiff declined nerve block therapy.  Nurse Shafer prescribed Norco noting

that, "Dr. Tiso cautioned that opiate is not the answer and is with tolerance issues, especially

since the MRI and EMGs were negative".  Morever, Nurse Shafer sent plaintiff to "LFTs and a

urine drug screen for chronic medication use as well as per our policy".  (T. 450).

  On November 19, 2008, plaintiff complained of pain in her neck, shoulders, arms and legs

with aching, burning and numbness. (T. 447).  Nurse Shafer noted that drug screens were within

normal limits.  Plaintiff continued to express concerns about nerve blocks prompting Nurse

Shafer to add Relafen to her Norco regimen.  On January 21, 2009 and March 20, 2009, plaintiff

presented to Nurse Shafer with the same complaints.  Plaintiff's physical examinations yielded

tenderness and a limited range of motion secondary to pain.  Plaintiff's treatment plan was

---

[4] Relafen is the brand name for a preparation of nabumetone, a nonsteroidal antiinflammatory drug. *See Dorland's* at 1248, 1645.

[5] Norco is a narcotic pain reliever consisting of hydrocodone bitartrate and acetaminophen. *Dorland's* at 1309.

unchanged but she was referred to a neurologist for headaches and a new MRI was requested. (T. 443 - 447).

On August 3, 2009, Nurse Shafer prepared a Medical Source Statement ("MSS").  Nurse Shafer outlined plaintiff's complaints noting "worse with sitting or standing too long".  Nurse Shafer's clinical findings were "minimal cervical disk bulge, negative NCS/EMGs upper ext 4/08".  (T. 435).  In the portions of the form regarding plaintiff's ability to work, Nurse Shafer noted "unknown pt. not available" or "unknown without FCE".

In December 2009, plaintiff returned to the office after a nine month absence claiming that she had "insurance issues".  Upon examination, Nurse Shafer noted that plaintiff's gait and station were normal, trapezius tenderness, normal strength and tone, range of motion was "normal", grip and extremity flexion and extension were slightly weaker on the right.  Plaintiff was directed to restart Relafen and Norco and an MRI of her brain was ordered due to chronic headaches and a family history of "MS".

On February 10, 2010, plaintiff returned and while her physical examination was unchanged, Nurse Shafer noted the results of her January 2010 EMG/NCVs, as discussed *supra*.  Plaintiff's medications were continued and NCS/EMGs were scheduled for plaintiff's lower extremities.  (T. 478).   On April 1, 2010, plaintiff had her last visit, of record, with Nurse Shafer. Nurse Shafer noted that plaintiff's MRI of her brain was normal.  Upon examination, she found plaintiff's gait/station to be normal, and noted that her extremities were "without tenderness, swelling, crepitation or discoloration".  She found that plaintiff exhibited 9-10/18 "classic fibromyalgia tender points".  Plaintiff's treatment regimen remained unchanged.

On April 1, 2010, Nurse Shafer completed a second MSS and opined that plaintiff's prognosis was "fair" and that she was capable of low stress jobs.  (T. 466).  Nurse Shafer stated

that plaintiff could walk one city block, sit/stand for twenty minutes and less than two hours in an eight hour workday.  Moreover, she stated that plaintiff did not need an ambulatory device. Nurse Shafer opined that plaintiff could occasionally lift less than ten pounds and rarely lift ten pounds; occasionally look down and turn head and frequently hold her head still.  Nurse Shafer stated that she could occasionally stoop and grasp, turn or twist objects and that she would likely miss more than four days per month from work.  She noted that "temp. change affects pain".  (T. 468).

On April 14, 2010, Nurse Shafer prepared an Updated MSS.  The question posed was whether she could "state with a reasonable degree of medical certainty that the limitations of function that she expressed in her 8/30/2009 MSS, still exist and persist to the same degree".  In response, Nurse Shafer stated "no" and explained that updated NCS/EMGS of plaintiff's upper extremities revealed, "R cervical radiculitis; 4/9/10 EMGS R S Radiculitis". (T. 469).  This Updated MSS was co-signed by Mary Trusilo, M.D.

The ALJ discussed Nurse Shafer's August 3, 2009, April 1, 2010 MSS and April 14, 2010 Updated MSS co-signed by Nurse Shafer and Mary Trusilo, M.D.  The ALJ assigned "little weight" to the statements.  (T. 500).  The ALJ noted that, in the August 3, 2009 statement, Nurse Shafer, "declined to furnish any functional limitations".   Moreover, the ALJ noted that while the April 1, 2010 statement contained functional limitations, the April 14, 2010 statement overruled that statement because:

> [w]hen queried on April 14, 2010 whether the limitations of function for the claimant set forth by Nurse Practitioner Shafer in her August 3, 2009 medical source statement still exist and persist to the same degree, Dr. Trusilo and Nurse Practitioner Shafer replied in the negative.  (T. 500).

The ALJ acknowledged the Regulations and his obligation to consider medical opinions from "other sources" but found:

> the undersigned nonetheless finds [Nurse Shafer's] assessment of the claimant's limitations to be inconsistent with the objective medical evidence and the longitudinal record of medical care. Even if it could somehow be argued that Dr. Trusilo endorsed Nurse Practitioner Shafer's April 1, 2010 medical source statement on April 14, 2010, the medical source statement of April 1, 2010 could only be given controlling weight as the opinion Dr. Trusilo if this assessment was supported by medically acceptable clinical and laboratory diagnostic techniques and was not inconsistent with the other substantial evidence in the claimant's case record. Nevertheless, the determination on April 1, 2010 that the claimant could not perform work at even the sedentary level of exertion is completely inconsistent with the treatment notes and reports of Dr. Trusilo, which show absolutely no objective clinical or diagnostic findings to support such an assessment for the claimant, but rather, are based solely on the claimant's subjective report of her own symptoms. (T. 500-501).

Based upon the Regulations, Nurse Shafer is not a treating source subject to the treating physician rule because a nurse practitioner is not an acceptable medical source. *Rockwood v. Astrue*, 614 F.Supp.2d 252, 270 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1513(d), 416.913(d) (listing a nurse practitioner as an other source, and not an acceptable medical source)). Accordingly, the ALJ was not compelled to afford Nurse Shafer's opinions controlling weight. Further, although the April 14, 2010 Updated MSS was co-signed by Dr. Trusilo, the Court could find no evidence that Dr. Trusilo had a treating relationship with plaintiff. *Towers v. Astrue,* 2010 WL 3338724, at *4 (N.D.N.Y. 2010). There is no evidence that Dr. Trusilo ever personally examined plaintiff or had an ongoing treatment and physician-patient relationship with plaintiff. Accordingly, the ALJ was not compelled to assign significant or controlling weigh to the opinions expressed in the Update MSS co-signed by Dr. Trusilo.

Moreover, even assuming Dr. Trusilo was plaintiff's treating physician, Dr. Trusilo's conclusions and Nurse Shafer's opinions are not supported by their own progress notes, the objective medical evidence or the opinions of other treating physicians and providers. Throughout plaintiff's treatment, Nurse Shafer repeatedly noted that her physical examinations

were normal or unremarkable and she commented that films and objective testing were consistently negative.  Nurse Shafer's examinations and testing failed to provide any explanation for plaintiff's subjective complaints of pain.

Moreover, upon review of the remainder of the medical evidence, the Court finds that substantial evidence supports the opinions in the MSS or Updated MSS.  In addition to her treatment with Nurse Shafer, plaintiff treated with Ethan Flakes, M.D. and Joseph Merola, RPA at North Medical Family Physicians, P.C. (T. 344).  From January 2006 until January 2007, plaintiff had approximately nine visits at North Medical.  During her visits, Dr. Flakes consistently found that plaintiff displayed a good range of motion but her extension and flexion were limited, plaintiff had tenderness on palpation and her deep tendon reflexes were intact, her grip was adequate and her muscle strength was "5/5".  Dr. Flakes diagnosed plaintiff with cervical radiculopathy and prescribed Hydrocodone, Anexsia and Skelaxin.[6]

On October 23, 2006, upon referral from Dr. Flakes, plaintiff was examined by Deborah L. Struchen, CRANP-BC, CNS for Dr. Joseph Catania at New York Pain Center.[7] (T. 336).  Plaintiff complained of neck pain.  Upon examination, Struchen found plaintiff's range of motion normal on extension but limited on flexion and rotation and tenderness in plaintiff's spine and shoulders.  NP Struchen added Doxepin and Zanaflex to plaintiff's prescription medication regimen and recommended nerve blocks and chiropractic care.[8]  (T. 336).

---

[6] Skelaxin is a centrally acting skeletal muscle relaxant used in the treatment of painful musculoskeletal conditions. *Dorland's* at 1163, 1748.  Anexsia has been approved for the treatment of chronic pain combining the pain relievers acetaminophen and hydrocodone, an opiate-based narcotic. www.medilexicon.com (last visited August 20, 2012).

[7] Based upon the record, this was the first visit plaintiff had with New York Pain Center.  She returned in February 2008 and was examined by Nurse Shafer.

[8] Zanaflex is used as a short-acting agent to manage the increased muscle tone associated with spasticity, as that related to multiple sclerosis or spinal cord injury. *Dorland's* at 1958, 2119.  Doxepin is indicated for use in treating depression and anxiety. RxList, Sinequan (Doxepine), http://www.rxlist.com/sinequan-drug.htm (last visited

On December 28, 2006, plaintiff returned to Dr. Merola and advised that chiropractic care was "not helping". On January 4, 2007 and January 29, 2007, plaintiff complained of left arm paresthesis. Dr. Flakes discontinued Vicodin and prescribed Flexeril and Motrin.[9] On March 26, 2007, plaintiff had her last visit with Dr. Flakes. (T. 331 - 334).

On June 4, 2007, plaintiff had an initial visit with Michael Nolan, M.D. (T. 413). Dr. Nolan noted plaintiff "has no doctor" and has "several issues" and "constant pain". Dr. Nolan stated that plaintiff's MRI was negative and her x-ray revealed degenerative joint disease. Dr. Nolan noted that Dr. Flakes treatment consisted of opioids. Dr. Nolan prescribed Lyrica. On June 19, 2007, plaintiff returned to Dr. Nolan and described her neck pain as "6/10". (T. 411). Dr. Nolan noted that plaintiff had some relief with Lyrica and added Lidoderm to her prescriptions and referred her to the pain clinic. On July 16, 2007 and August 3, 2007, plaintiff had the same complaints but noted that her pain decreased with medication.

As discussed in Part II, on August 23, 2007, plaintiff treated with Dr. Carri Jones. (T. 360) and on September 12, 2007, plaintiff's NCV/EMG revealed normal results. (T. 362).

On December 6, 2007, plaintiff had a follow up visit with Dr. Nolan. Dr. Nolan noted that plaintiff had been treated at several pain clinics and that Dr. Jones "recommended staying away from addictive medication". Plaintiff complained of a headaches and stated that she had no relief with Fentanyl.[10] Dr. Nolan noted, "Dr. Carri Jones sees no reason why she can't work and I have to go with her expertise on that". (T. 406). Dr. Nolan prescribed Ultracet. On February 4, 2008,

---

August 20, 2012).

[9] Vicodin is a semisynthetic opioid analgesic derived from codeine but having more powerful sedative and analgesic effects. *Dorland's* at 890, 2084.

[10] Fentanyl is a narcotic pain medication. http://www.drugs.com/fentanyl.html (last visited August 20, 2012).

plaintiff had her last visit with Dr. Nolan complaining that her medication provided limited relief. Dr. Nolan noted that plaintiff exhibited, "idopathic neck pain without a generator". (T. 404).   Dr. Nolan referred plaintiff to the New York Pain Center and prescribed Vitamin D for rickets and Chantix for smoking cessation.

Based upon the entirety of the medical record, the Court finds that substantial evidence supports the ALJ's decision to assign only limited weight to Nurse Shafer's opinions. As such, the Court finds no basis to remand on this issue.

### B.    Duty to Recontact

Plaintiff argues that the ALJ had a duty to recontact Dr. Trusilo or Nurse Shafer for clarification before affording their opinions "little weight".   An ALJ has an obligation to develop the administrative record, including, in certain circumstances, recontacting a source of a claimant's medical evidence, *sua sponte*, to obtain additional information. *Lukose v. Astrue*, 2011 WL 5191784, at *3 (W.D.N.Y.2011) (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998)). The ALJ will obtain additional evidence if he/she is unable to make a determination of disability based on the current record. 20 C.F.R. § 404.1527(c)(3). The Regulations provide:

> If the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence under the provisions of §§ 404.1512 and 404.1519 through 404.1519h. We will request additional existing records, recontact your treating sources or any other examining sources, ask you to undergo a consultative examination at our expense, or ask you or others for more information. We will consider any additional evidence we receive together with the evidence we already have.

20 C.F.R. § 404.1527(c)(3).

While the ALJ has a duty to recontact treating physicians to obtain a complete medical history, 20 C.F.R. §§ 404.1212(e)(1), 416. 912(e)(1), the ALJ had no such duty in this matter

because Nurse Shafer was not a "treating physicians". Moreover, as discussed, the record lacks definitive evidence that Dr. Trusilo was a treating source. However, even assuming that Dr. Trusilo was a treating physician, plaintiff has not established any gap or inconsistency in the record that would compel the ALJ to recontact Dr. Trusilo. *See Spruill v. Astrue*, 2008 WL 4949326, at *4 (S.D.N.Y.2008) (the record contained the treating physicians treatment notes for the dates that the plaintiff claims she was treated). After reviewing the administrative transcript, the Court finds that the record adequately and completely reflected plaintiff's medical history. Accordingly, the ALJ had no obligation to contact any of plaintiff's physicians to supplement the existing record.

### C.    Kalyani Ganesh, M.D.

An ALJ may rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of Social Security disability." *Williams v. Astrue*, 2011 WL 831426, at *11 (N.D.N.Y.2011) (citing 20 C.F.R. §§ 404.1512(b)(6), 404.1513(C), 404.1527(f)(2), 416.912(b)(6), 416.913, and 416.927(f)(2)). The ALJ may give significant weight to the opinions of consultative physicians if the conclusions are well supported by clinical evidence; consistent with the overall record and claimant's reported activities are based upon a thorough examination. *See Palaschak v. Astrue*, 2009 WL 6315324, at *6 (N.D.N.Y.2009) (citing 20 C.F.R. 404.1527(f)). If an ALJ relies upon a non-examining reviewer's opinion, that opinion must be supported by the bulk of the record. *See* Social Security Ruling ("SSR") 96–6p, 1996 WL374180, *2 (July 1996); *see also Rocchio v. Astrue*, 2010 WL 5563842, at *14 (S.D.N.Y.2010).

Plaintiff argues that the ALJ erred when he assigned "significant weight" to Dr. Ganesh's opinions. On October 23, 2007, Dr. Ganesh performed an orthopedic evaluation of plaintiff at the

request of the agency.  Dr. Ganesh noted that plaintiff could not squat during the examination but that she displayed a normal gait, normal grip strength and a full range of motion in her shoulders. (T. 371).  Plaintiff exhibited pain in her cervical spine upon rotation and tenderness.  Dr. Ganesh diagnosed plaintiff with a very mild disc bulge of the cervical spine and opined that she had mild limitation for lifting, carrying, pushing and pulling but no limitation for sitting, standing or walking.  The ALJ assigned "significant weight" to Dr. Ganesh's October 23, 2007 evaluation because, "Dr. Ganesh's medical source statement for the claimant is consistent with the objective medical and other evidence of record, as well as with the longitudinal record of medical care".

The ALJ's decision is supported by substantial evidence.  Most notably, the ALJ afforded "substantial weight" to plaintiff's treating physician, Michael R. Nolan, M.D. because his opinions were consistent with the preponderance of medical evidence.  (T. 469).  Plaintiff does not argue that the ALJ erred in assigning weight to Dr. Nolan's opinion and a review of the record reveals that Dr. Ganesh's opinions are supported by Dr. Nolan's assessment and by substantial medical evidence.  While Dr. Ganesh's opinion are contrary to the opinions expressed by Nurse Shafer, this Court has already determined that Nurse Shafer's opinions are not supported by substantial evidence.  The ALJ  provided adequate reasons for relying upon Dr. Ganesh's opinion and assigned the appropriate weight to the doctor's conclusions. Based upon the aforementioned, the Court finds that the ALJ's RFC is supported by substantial evidence.

**III.    Credibility**

"The ALJ has discretion to assess the credibility of a claimant's testimony regarding disabling pain and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979).  If plaintiff's testimony concerning the intensity, persistence or

functional limitations associated with his impairments is not fully supported by clinical evidence,

the ALJ must consider additional factors in order to assess that testimony, including: 1) daily

activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and

aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5)

other treatment received; and 6) other measures taken to relieve symptoms. 20 C.F.R. §§

404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).  The issue is not whether the clinical and objective

findings are consistent with an inability to perform all substantial activity, but whether plaintiff's

statements about the intensity, persistence, or functionally limiting effects of her symptoms are

consistent with the objective medical and other evidence.  *See* SSR 96–7p, 1996 WL 374186, at

*2 (SSA 1996). One strong indication of credibility of an individual's statements is their

consistency, both internally and with other information in the case record.  SSR 96–7p, 1996 WL

274186, at *5 (SSA 1996).

      After considering plaintiff's subjective testimony, the objective medical evidence, and any

other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony.

*Saxon v. Astrue*, 781 F.Supp.2d 92, 105 (N.D.N.Y. 2011) (citing 20 C.F.R. §§ 404.1529(c)(4),

416.929(c)(4)).  An ALJ rejecting subjective testimony must do so explicitly and with specificity

to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and

whether his decision is supported by substantial evidence.  *Melchior v. Apfel*, 15 F.Supp.2d 215,

219 (N.D.N.Y.1998) (quoting *Brandon v. Bowen*, 666 F.Supp. 604, 608 (S.D.N.Y.1987) (citations

omitted)).  The Commissioner may discount a plaintiff's testimony to the extent that it is

inconsistent with medical evidence, the lack of medical treatment, and her own activities during

the relevant period. *Howe–Andrews v. Astrue*, 2007 WL 1839891, at *10 (E.D.N.Y.2007).  The

ALJ must also consider whether "good reasons" exist for failing to follow the prescribed

treatment, e.g. religious objections, lack of ability to pay, significant risks associated with treatment. SSR 82–59; *see also Grubb v. Apfel*, 2003 WL 23009266, at *4–*8 (S.D.N.Y. 2003).

Plaintiff claims that the ALJ's credibility assessment is flawed because: (1) the ALJ failed to discuss the location, duration and frequency of plaintiff's symptoms and the ineffectiveness and side effects of plaintiff's medication; (2) failed to properly consider plaintiff's daily activities; and  (3) the ALJ improperly cited to gaps in her treatment as a basis to question her credibility.

On the issue of credibility, the ALJ found:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the symptoms alleged by the claimant. Nevertheless, the claimant's statements concerning the intensity, persistence and limiting effects of her symptoms are not fully credible to the extent they are inconsistent with the above residual functional capacity assessment.

> The claimant is clearly able to engage in a wide range of independent daily activities.  She can cook, clean, do laundry, shower, bathe, dress, take care of her children, watch television, listen to the radio, groom herself, manager her own funds, drive, shop, do dishes, and walk.

> There are only minimal positive diagnostic and clinical findings to corroborate the location, duration, frequency, and intensity of the claimant's pain and other symptoms as a result of her impairments. The record also reflects significant gaps in claimant's treatment.  For several years, there were no findings at all for the claimant. (T. 498).

### A.  Location, Duration, Frequency, Intensity of Symptoms and Side Effects of Medication

During the hearing, plaintiff testified:

> Q.  Are you taking any medication [for your neck]?
> A.  Yes.
> Q.  What medications?
> A.  I take hydrocodone, five 325s, and Relafen, which is an anti-inflammatory/pain, 750s? (T. 56-57).

Plaintiff continued:

> Q.    Okay.   Now, what medications besides hydrocodone and
>        Relafen that you've already testified to are you taking?
> A.    That's it.
> Q.    Okay.  Did you used to take other medications?
> A.    Yes.
> Q.    Okay.  And they removed you from them?
> A.    Yes.
> Q.    Is there any reason why they've switched or removed you
>        from those medications?
> A.    Because they weren't working.  (T. 58).

The ALJ noted that, "claimant is taking a variety of medications with some side effects". (T. 498).

Plaintiff argues that the ALJ failed to discuss the fact that her medication was ineffective and resulted in fatigue, heartburn, nausea, vomiting, numbness and diarrhea.  The Court has reviewed the administrative transcript and notes that plaintiff never described such side effects to the ALJ.  Indeed, plaintiff testified that she stopped taking medications because they did not work.  *See Rockwood v. Astrue,* 614 F.Supp.2d 252, 282 (N.D.N.Y. 2009) (the ALJ did not err when he failed to discuss side effects of medication because the plaintiff's own testimony indicated that the pain medication did not have any side effects).  Moreover, plaintiff's medical records do not support her claims of such extensive side effects.  In June 2007, Dr. Nolan prescribed Lyrica for plaintiff.   On February 4, 2008, Dr. Nolan noted that plaintiff complained that Lyrica made her tired.  However, in April 2008, plaintiff told Nurse Shafer that, "[p]rimary physician is prescribing Lyrica at bedtime that significantly helps her sleep".  (T. 458).  With respect to Relafen and Topomax, once plaintiff advised Nurse Shafer that these medications caused side effects, they were discontinued. (T. 449, 458).   Plaintiff also argues that the ALJ disregarded the side effects of Chantix.  Plaintiff claims that the medication made her "sick and lose weight".  Plaintiff received a prescription for Chantix to assist in her efforts to quit smoking. The medication was not prescribed for the impairments relevant to this matter and thus, the ALJ's

failure to discuss any particular side effect was not error as the side effects had no bearing on the ALJ's determination. *Waitt v. Astrue*, 2012 WL 2343440, at *14 (D.Mass. 2012) (the plaintiff claimed that Chantix gave her bad dreams) (citing *Castro v. Barnhart*, 198 F.Supp.2d 47, 53 (D.Mass. 2002) (ALJ's failure to address medications and side effects was not ground for reversal where the claimant had not alleged that the effectiveness of the medications or their side effects were an issue in the case)).

Plaintiff also claims that the ALJ did not address the medical records corroborating plaintiff's complaints of bilateral arm and leg numbness and swelling. This argument lacks merit and is unsupported by the record. As discussed previously, and noted by the ALJ, the record lacks any significant positive objective findings to corroborate plaintiff's subjective complaints of disabling pain.

### B.    Activities of Daily Living

Plaintiff claims that ALJ did not address her activities of daily living in an accurate manner. During the hearing, plaintiff testified that her family helps with the housework and that on "bad days", she does not get out of bed. (T. 60-61). The ALJ is not required to accept plaintiff's testimony regarding her daily activities when plaintiff's testimony is unsupported and inconsistent with the clinical findings and daily activities in the record for the relevant time period. *Fanton v. Astrue*, 2011 WL 282383, at *5 (W.D.N.Y. 2011). During the course of her treatment, plaintiff's providers described her as a "stay-at-home mom" and "homemaker". (T. 360, 371). Moreover, Dr. Nolan noted that Dr. Jones, "sees no reason why she can't work". (T. 406). Plaintiff's records lack any reference to "bad days" nor do they indicate that plaintiff can only perform household chores with the assistance of her family. Accordingly, the Court finds no error in the ALJ's assessment of plaintiff's daily activities.

**D.      Ability to Afford Treatment**

Plaintiff contends that the ALJ failed to consider plaintiff's inability to afford medical treatment as a justifiable cause for failing to continue treatment.  It is improper for the ALJ to question plaintiff's credibility based **solely** on her inability to afford treatment.  *Garrett v. Astrue,* 2007 WL 4232726, at *9 (W.D.N.Y. 2007) (emphasis added).  In this matter, the ALJ did not reference plaintiff's gap in treatment to negate other compelling evidence or as the sole reason for discrediting her testimony, but properly mentioned it as one of the factors used in analyzing plaintiff's credibility.  *See Campbell v. Astrue*, 596 F.Supp.2d 446, 454 (D.Conn. 2009).  Moreover, plaintiff has failed to present any evidence that she did not seek treatment from March 2009 until December 2009 because of an inability to pay.  *See id.* (the record contains no evidence that would support a finding that access to treatment existed for a number of years, ceased for exactly 20 months, and then returned).

Having reviewed the Administrative Transcript in its entirety, the Court finds that the ALJ applied the correct legal standard, enumerated in 20 C.F.R. § 404.1529(c)(3)(i)-(iv), in assessing plaintiff's credibility. Taken as a whole, the record supports the ALJ's determination that plaintiff's claims were not entirely credible. The ALJ adequately specified the reasons for discrediting plaintiff's statements.  Accordingly, the ALJ's analysis of the record and decision as to plaintiff's credibility was based on substantial evidence.

**V.      Vocational Expert**

Plaintiff claims that the ALJ failed to ask hypothetical questions supported by the record as directed by the Appeals Council.  Specifically, plaintiff claims that based upon the ALJ's errors in formulating the RFC, the hypothetical questions posed were incomplete.

Under the Social Security Act, the Commissioner bears the burden of proof for the final determination of disability. *Pratt v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996). Generally speaking, if a claimant suffers only from exertional impairments, then the Commissioner may satisfy his burden by resorting to the applicable grids.[11] *Pratt,* 94 F.3d at 39. The grids "take[ ] into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience". *Rosa*, 168 F.3d at 79. Ordinarily, the ALJ need not consult a vocational expert, and may satisfy this burden "by resorting to the applicable medical vocational guidelines (the grids)". *Id*. at 78 (citing 20 C.F.R. Pt. 404, Subpt. P, App.2).

The Second Circuit has held that "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert or preclude reliance" on the grids.[12] *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir.1986). The testimony of a vocational expert that jobs exist in the economy which claimant can obtain and perform is required only when "a claimant's nonexertional impairments significantly diminish his ability to work-over and above any incapacity caused solely from exertional limitations-so that he is unable to perform the full range of employment indicated by the medical vocational guidelines." *Id*. The use of the phrase "significantly diminish" means the "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity". *Id*. at 606. Under these circumstances, to satisfy his

---

[11] An "exertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e. sitting, standing, walking, lifting, carrying, pushing, and pulling). 20 C.F.R. §§ 404.1569a(b), 416.969a(b); *see also Rodriguez v. Apfel*, 1998 WL 150981, at *10, n. 12 (S.D.N.Y.1998).

[12] A "nonexertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Examples of nonexertional limitations are nervousness, inability to concentrate, difficulties with sight or vision, and an inability to tolerate dust or fumes. 20 C.F.R. §§ 404.1569a(a), (c)(i), (ii), (iv), (v), 416.969a(a), (c)(i), (ii), (iv), (v); *see also Rodriguez* , 1998 WL 150981, at * 10, n. 12.

burden at step five, the Commissioner must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Rosa*, 168 F.3d at 78 (quoting *Bapp*, 802 F.2d at 604). Therefore, when considering nonexertional impairments, the ALJ must first consider the question-whether the range of work the plaintiff could perform was so significantly diminished as to require the introduction of vocational testimony. *Samuels v. Barnhart*, 2003 WL 21108321, at *12 (S.D.N.Y.2003) (holding that the regulations require an ALJ to consider the combined effect of a plaintiff's mental and physical limitations on his work capacity before using the grids).

The ALJ should elicit testimony from the expert by posing hypothetical questions. If a hypothetical question does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability. *Melligan v. Chater*, 1996 WL 1015417, at *8 (W.D.N.Y.1996). The "[p]roper use of vocational testimony presupposes both an accurate assessment of the claimant's physical and vocational capabilities, and a consistent use of that profile by the vocational expert in determining which jobs the claimant may still perform." *Lugo v. Chater*, 932 F.Supp. 497, 503 (S.D.N.Y.1996). Further, there must be "substantial evidence to support the assumption upon which the vocational expert based his opinion." *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir.1983).

In this case, the ALJ posed questions to the vocational expert, David A. Festa.  The ALJ inquired as to whether jobs existed in the national economy for individuals of plaintiff's age with the restrictions described in the RFC.  The vocational expert provided examples of jobs that an individual, with such specifications, could perform such as a counter clerk or a shipping receiving weigher.  Plaintiff's attorney also posed questions to the vocational expert.  However, the ALJ

noted, "'[t]he questions posed by the claimant's attorney, however, were grounded on assumptions that are unsupported by the record". Thus, the ALJ afforded little weight to the vocational expert's responses. (T. 502-503).

In support of remand, plaintiff argues that the hypothetical questions were incomplete due to the ALJ's errors in evaluating the RFC and plaintiff's subjective complaints. As discussed previously, the ALJ's RFC analysis was supported by substantial evidence. There is no support for plaintiff's contention that she suffered from additional impairments that were improperly omitted from the RFC. Plaintiff has not set forth any other argument with respect to the ALJ's assessment at step five of the sequential analysis. Thus, the Court concludes that the ALJ's decision is supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED**, that the decision denying disability benefits be **AFFIRMED**; and it is further

**ORDERED** that plaintiff's complaint is **DISMISSED**; and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated:  August 31, 2012
        Albany, New York

Mae A. D'Agostino
U.S. District Judge